IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CENTIMARK CORPORATION,     )
     )
     Plaintiff,     )
     )
     vs.     )     Civil Action No. 05-708
     )
PEGNATO & PEGNATO ROOF     )     Magistrate Judge Amy Reynolds Hay
MANAGEMENT, INC., D/B/A     )
PEGNATO & PEGNATO BUILDING     )
SYSTEM SERVICES, INC., and     )
WILLIAM S. PEGNATO, and     )
MARYELLA PEGNATO,     )
     )
     Defendants.     )

OPINION

HAY, Magistrate Judge

       Presently before the Court is a motion for summary judgment filed by plaintiff

CentiMark Corporation ("CentiMark") [Dkt. 44], a motion for partial summary judgment filed by

the individual defendants, William and Maryella Pegnato ("William" and "Maryella,"

respectively) (collectively, "the Pegnatos") [Dkt. 48]; a motion to withdraw as counsel for

defendant Pegnato & Pegnato Building System Services ("Pegnato") [Dkt. 34]; and a motion for

spoliation sanctions against William and Maryella filed by CentiMark [Dkt. 62].

     I.     Procedural and Factual History

       CentiMark markets, sells, installs, and services roofs and roofing systems to

commercial and industrial customers. On August 22, 2001, CentiMark entered into a Strategic

Alliance Agreement (the "Alliance") with Pegnato whereby Pegnato would provide roofing

repair services to customers on CentiMark's behalf. Pegnato would bill and collect the amounts

due from the customers and then remit a portion of the fees collected to CentiMark. William and

Maryella Pegnato are husband and wife and co-founded Pegnato in approximately 1992.

William and Maryella were the majority shareholders of Peganto until 1999 when twenty-five

percent of the outstanding shares were sold to outside investors to raise capital. By August 2001,

outside investors owned fifty-one percent of the voting shares of stock.

For approximately three years, Pegnato and CentiMark conducted business in

accordance with the provisions of the Alliance. Then, in March 2004, Pegnato was experiencing

some financial difficulty and anticipated a problem paying CentiMark. In an email dated March

22, 2004, from Donna Taylor, Pegnato's National Account Manager to Susan Crile, a marketing

representative for CentiMark/Pegnato, Pegnato requested permission to pay CentiMark by check,

rather than by wire transfer. The pertinent correspondence read:

> I spoke with [WilliamPegnato] about the wire transfers and he
> explained to me that for the next 60 days we are going to have
> some problems getting these to you on a regular basis due to
> internal situations. He asked that you please be patient with us and
> he can assure you that it'll be resolved soon. In the meantime, he
> has asked if you would prefer getting weekly checks? This will
> resolve the not knowing.

Plaintiff's Appendix to Brief in Support of Motion for Summary Judgment ("Pl.'s Appx."), Exh.

G [Dkt. 47]. When Crile questioned why the alternative payment method was necessary, Taylor

responded: "This is what Bill Pegnato explained to me yesterday." Id.

In August 2004, although Pegnato continued to provide and receive payment for

roofing services to customers, it ceased paying CentiMark as dictated by the terms of the

Alliance. Starting in October of that year and into January 2005, some customers paid

CentiMark directly for roofing services provided by Pegnato. On February 15, 2005, CentiMark

and Pegnato negotiated a letter agreement whereby CentiMark would apply the amounts customers paid directly to it to the balance owed by Pegnato.  The letter memorializing the agreement was signed by "Maryella Pegnato, President."  Id.  at Exh. H.  The joint enterprise established under the Alliance ended in April 2005 when CentiMark gave written notice to Pegnato that it was terminating the agreement.

On May 23, 2005, CentiMark filed an action against Pegnato and William and Maryella.  The complaint included breach of contract and unjust enrichment counts, and a request for accounting against Pegnato.  The complaint also included a conversion claim against both Pegnato and William and Maryella, individually.  According to an order dated September 30, 2005, counsel had advised that the matter had been settled and the court decreed that the case be marked closed noting that "the only matters remaining to be completed are the payment of the settlement proceeds, if any, and the submission of a stipulation for dismissal ...."  See Dkt. 11.  The court also informed that the order was not a dismissal or disposition of the action and retained jurisdiction to consider any issue arising until the settlement was finalized.

On November 18, 2005, before a stipulation of dismissal had been filed, however, Pegnato filed a Voluntary Petition seeking Chapter 11 relief in the United States Bankruptcy Court for the Central District of California.  William signed the petition as the Chief Executive Officer of Pegnato, and represented in a number of sworn declarations filed in conjunction with the bankruptcy proceedings that he was the CEO of Pegnato, "directly responsible for all facets of [Pegnato's] financial affairs . . . .  Accordingly, [William]  ha[s] personal knowledge of the material aspects of [Pegnato's] day-to-day business operations, financial condition, and books and records." Id. at Exh. N, ¶ 3.

On January 3, 2006, the bankruptcy court entered an order approving the sale of substantially all of Pegnato's assets to First Service Networks, Inc. ("First Service"), and the bankruptcy case was thereafter dismissed and closed.[1]

The hibernation of the present action was disturbed by the conclusion of the bankruptcy proceedings and an order of court entered on April 16, 2007, granting CentiMark's consent motion to reopen the case and place it on the active docket. The action was designated for placement in the court's Alternate Dispute Resolution ("ADR") Program and the parties stipulated to mediation before a neutral arbitrator. That process failed to produce a settlement and discovery proceeded.

On October 26, 2007, counsel for Pegnato filed a motion to withdraw its representation averring that the resignation of Pegnato's corporate officers and directors in conjunction with the bankruptcy case resulted in an "evaporation" of its corporate client. Counsel claimed that it cannot fulfill its obligation to act on behalf of the corporation because that entity is now defunct. CentiMark has opposed the motion, asserting that it would be prejudiced by what it characterized as a veiled attempt by Peganto to avoid its discovery obligations.

On October 30, 2007, CentiMark filed an emergency motion to compel production of documents, claiming that the defendants failed to produce internal correspondence regarding the Alliance, correspondence with third parties on the subject agreement, including communications with First Service, and/or any board of directors, shareholder, or committee

---

[1]    William and Maryella were extended and accepted employment as a component of First Service's purchase of Pegnato's assets.

meeting minutes where the Alliance or CentiMark were discussed.  On December 3, 2007, the court denied the motion, reasoning that  an emergency did not exist as CentiMark had the option of seeking additional time for discovery and noting that CentiMark itself had not complied with the court's order on motion practice.  Three days later, the court held a telephone hearing on the discovery dispute wherein CentiMark reiterated its complaint concerning the non-production of integral documents.  The court provided CentiMark with the choice to either issue a subpoena for the requested documents or to file a motion for spoilation.

On December 21, 2007, CentiMark filed a motion for summary judgment against Pegnato and William.  On that same date, William and Maryella filed their motion for partial summary judgment against CentiMark.  Pegnato neither filed a summary judgment motion nor responded to CentiMark's motion against it.

On March 7, 2008, CentiMark filed a motion for spoilation sanctions.  In response to opposing counsel's suggestion that some of the documents requested through discovery may have been transferred in conjunction with the purchase of Pegnato's assets, CentiMark served a subpoena on First Service.  First Service advised that it did not possess the documents, and CentiMark therefore concluded that they no longer existed and that the defendants breached their obligation to preserve information that might be relevant to the litigation.  CentiMark thus petitioned the court to preclude the defendants from introducing testimony regarding the identities of individuals who did or did not participate in Pegnato's alleged retention of CentiMark funds.

William and Maryella responded to the motion on April 9, 2008, arguing therein that CentiMark has failed to point to any evidence that would demonstrate that defendants were

responsible for the loss of the documents at issue or that it has been prejudiced by the loss. Moreover, William and Maryella argue that even if CentiMark could demonstrate prejudice, the sanction CentiMark seeks is out of proportion to the conduct attributed to them.

II.     Motion to Withdraw as Counsel for Pegnato[2]

Counsel moves to withdraw for the stated reason that its corporate client disappeared on August 29, 2006, when the corporation's bankruptcy case was dismissed and the corporate officers and directors resigned. Counsel claims that the resignation of the corporate officers/directors placed it in "the untenable position of being obligated to act on behalf of the Corporation, while lacking the ability to do so." Motion to Withdraw, ¶ 15 [Dkt. 34].

Although it appears clear that counsel has taken no further action on behalf of Pegnato since the instant motion was filed on October 27, 2007, review of the progress of the present litigation reveals that counsel continued to act on behalf of Pegnato after the bankruptcy case was dismissed. Indeed, the record demonstrates that counsel entered a stipulation regarding selection of the ADR process in May of 2007 [Dkt. 17], filed a motion to reschedule a case management conference in June of 2007 [Dkt. 19], consented to jurisdiction of the magistrate judge in September of 2007 [Dkt. 30], and apparently attended a mediation before a neutral arbitrator in August of 2007 [Dkt. 27], all on behalf of Pegnato. Particularly contrary to counsel's position that it was afloat without a corporate boat is that Justin Barron, Esquire, one of the attorneys now petitioning to withdraw, *entered his appearance on behalf of the corporation on June 22, 2007*, some ten months after Pegnato supposedly disintegrated [Dkt. 21].

---

[2]     Counsel does not seek to withdraw its representation of individual defendants, William and Maryella.

6

Additionally, although counsel invokes terms such as "defunct" and "evaporated" to describe the current state of Pegnato, the actual legal status of the corporate defendant is listed as "suspended" on the California Business Portal website. Further, as of April 25, 2008, the corporation still has an address and an agent listed for service of process. See http://www.sos.ca.gov/business.

Finally, the pertinent local rule advises that counsel seeking to withdraw must give notice to the client. W.D. Pa. L.R. 83.2.2 D. Even though the California Business website still lists a designated individual for service of process for Pegnato, there was no certificate of service attached to counsel's motion to withdraw, nor was service to the designated agent indicated on the docket.

Non-compliance with the local rule, combined with counsels' activity on behalf of the corporation subsequent to the bankruptcy proceeding and Pegnato's continuing existence as a corporate entity and a defendant in this litigation suggest that, at this juncture, counsels' motion to withdraw from representation of Pegnato is properly denied. See Rhino Associates, L.P. v. Berg Manufacturing and Sales Corp., 531 F. Supp. 2d 652, 656 (M.D. Pa. 2007) ("[A] corporation must be represented in court by counsel").

III.     Motion for Spoliation Sanctions

It appears undisputed that during discovery CentiMark requested that defendants produce internal correspondence regarding the Alliance, correspondence with third parties on the subject agreement, including communications with First Service, and/or any board of directors, shareholder, or committee meeting minutes where the Alliance or CentiMark were discussed. See Plaintiff's Exhibits to Motion for Spoliation Sanctions ("Pl.'s Spoliation Exh."), Exh. C, Request

Nos. 2-4 [Dkt. 63]. It also appears undisputed that no such documents were produced by defendants. Consequently, in a letter dated October 10, 2007, counsel for CentiMark sent defendants a letter indicating as much and asking that they produce the missing documents. Id. at Exh. D. Counsel for defendants responded on October 15, 2007, indicating that William and Maryella "are not the custodians of the corporation's documents, and they do not know where such documents are maintained." Id. at Exh. E. Counsel for defendants subsequently informed CentiMark that the documents at issue had likely been transferred to First Service in conjunction with the sale of Peganto's assets.

On January 4, 2008, CentiMark served First Service with a subpoena seeking any relevant correspondence, memoranda and board meeting minutes that First Service received from Pegnato. Id. at Exh. F. Although First Service produced several documents, Pegnato's internal correspondence, memoranda and board meeting minutes were not amongst them. Id. at Exh. G. In response to a subsequent inquiry by CentiMark's counsel, First Service confirmed that it had produced all responsive documents in its possession. Id. at Exh. H.

It also appears that during discovery, which closed on September 28, 2007, the Pegnatos were deposed and testified that they did not participate in the retention of CentiMark's money but that others in the company were responsible for doing so. Without Pegnato's internal correspondence, memoranda and board meeting minutes, CentiMark argues that it is unable to refute the Pegnato's testimony and asks that the Pegnatos be sanctioned for failing to preserve the documents at issue.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

Mosaid Technologies, Inc. v. Samsung Electronics Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004) ("Mosaid"). Where a party destroys or alters relevant evidence, district courts have the discretion to impose sanctions which typically include summary judgment and/or dismissal of claims, the exclusion of countervailing evidence, and a jury instruction on the spoliation inference. Walters ex rel. Walters v. General Motors Corp., 209 F. Supp. 2d 481, 490 (W.D. Pa. 2002). The Court of Appeals for the Third Circuit has instructed that to determine whether sanctions are appropriate in the first instance and, if so, what level of sanction is warranted, the court should consider: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct in the future. Schmid v. Milwaukee Electric Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994) ("Schmid"). See Schroeder v. PennDOT, 551 Pa. 243, 251, 710 A.2d 23, 27 (1998) (expressly adopting the factors set forth in Schmid in determining appropriate sanctions for spoliation in Pennsylvania).

Here, CentiMark filed the instant complaint in May of 2005 alleging that William and Maryella authorized, instructed, and otherwise knowingly participated in Pegnato's refusal to pay CentiMark the money it was owed. Complaint ¶ 53. The sale of Pegnato's assets to First Service, however, did not occur until January of 2006, over six months later. During that period of time, the documents at issue, which were clearly relevant to the instant litigation, were in Pegnato's control and accessible by William and Maryella who were not only the President and Chief Operating Officer, respectively, of Pegnato at the time but were represented by counsel. See Pl.'s Spoliation Exh. K, ¶¶ 12, 14; Pl.'s Spoliation Exh. L, pp. 18-19, 72. Under these

circumstances, the Pegnatos had a duty to preserve evidence relevant to the litigation and their failure to do so was, at the very least, negligent. See Mosaid, 348 F. Supp. 2d at 336, quoting Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000) ("While a litigant is under no duty to keep or retain every document in its possession, even in advance of litigation, it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation"); Winters v. Textron, Inc., 187 F.R.D. 518, 520 (M.D. 1999) (Finding that knowledge of even a potential claim is sufficient to impose a duty to preserve evidence); Bowman v. American Medical Systems, Inc., No. 96-7871, 1998 WL 721079, at *3 (E.D. Pa. Oct. 9, 1998) ("A party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence"). See also Barsoum v. NYC Housing Authority, 202 F.R.D. 396, 400 (S.D.N.Y. 2001), citing Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("A party has a duty to retain evidence that it knows or reasonably should know may be relevant to pending or future litigation").

Moreover, the fact that defendants subsequently relinquished control over the relevant evidence when Peganto's assets were sold to First Service, which then lost or destroyed the evidence, does not relieve defendants of their responsibility in this regard as they had control of the documents for more than six months after this lawsuit was filed and before the assets were sold. Defendants could have -- indeed, should have -- taken precautions to preserve the information for litigation by maintaining copies of the documents pertaining to the lawsuit, giving CentiMark access to them before the sale was completed or, at the very least, by ensuring that CentiMark would have access to them after the sale was completed. See In re NTL, Inc. Securities Litigation, 244 F.R.D. 179, 197 (S.D.N.Y. 2007) (Finding that the defendant's duty to

preserve potentially responsive documents for litigation arose at the very latest when the suit was filed and before it emerged from bankruptcy, and that defendant therefore engaged in spoliation of evidence when it transferred documents to the new operational company without preserving (or ensuring that the new company would preserve) the relevant information). See also Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) ("If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence"); Bowman v. American Medical Systems, Inc., 1998 WL 721079, at *4 (Finding the fact that the evidence was actually destroyed by plaintiff's doctor rather than by the plaintiff himself, in no way relieved the plaintiff of his responsibility to preserve the allegedly defective product). Thus, despite William and Maryella's protestations to the contrary, they are responsible for the spoliation of these documents.

In this manner, Parkinson v. Guidant Corp., 315 F. Supp. 2d 760 (W.D. Pa. 2004) ("Parkinson"), upon which William and Maryella rely for the proposition that they were not at fault for the loss of the documents, is easily distinguishable from the instance case. In Parkinson, a guidewire manufactured by the defendants fractured during an angioplasty and stent procedure performed on the plaintiff. Following the operation, the defendants' attorney subpoenaed the guidewire from the hospital which had retained custody of it following the plaintiff's operation. The guidewire remained in the possession of defense counsel for approximately six weeks at which point it was turned over to the plaintiff's counsel. Several months later, upon inspection by the plaintiff's expert, it was discovered that only the tip of the fractured wire had been provided along with a separate, complete guidewire rather than the shaft of the fractured wire.

11

The plaintiff subsequently sought spoliation sanctions against the defendants arguing that the piece had been lost while the guidewire was in defense counsel's possession. The Court denied the motion finding that the evidence surrounding the chain of custody made it impossible to ascertain who was responsible for the missing piece and that any attempt to place blame would be purely speculative. Id. at 763-64. Indeed, it was not only unclear from the record whether the wire received by defense counsel from the Hospital's Risk Management Department was the actual wire from the plaintiff's procedure, but the hospital's attorney, who inspected the wire before turning it over to defense counsel, testified that he was not familiar with guidewires and could not ascertain whether the evidence he received from the Risk Management Department was two pieces of one wire or one piece of a fractured wire and another complete wire. Moreover, the defendants vehemently argued that the evidence they turned over to the plaintiff's attorney was the exact evidence that they received from the hospital. Thus, the Court was unable to conclude whether the evidence was missing due to the fault of the hospital, the defendants or the plaintiff. Id.

Here, however, unlike in Parkinson, there is no question that the documents at issue were in control of the Pegnatos while the instant litigation was pending and that they had a duty to preserve them for purposes of this litigation at that time. The fact that the Pegnatos subsequently relinquished control of the documents to a third party that then lost or destroyed them does not relieve the Pegnatos of their responsibility in the first instance and does not bring this case under the authority of Parkinson.

The second Schmid factor also weighs in favor of imposing spoliation sanctions as CentiMark has clearly been prejudiced by the destruction of these documents. Having brought

a claim for conversion against William and Maryella alleging that they individually authorized, instructed and otherwise knowingly participated in the retention of CentiMark's monies, any internal correspondence with third parties regarding the Alliance, and any board of directors or committee meeting minutes where the Alliance or CentiMark were discussed, would likely speak to those responsible for retaining CentiMark's money and, thus, would be highly relevant. Moreover, given the Pegnato's deposition testimony that various Chief Financial Officers and other shareholders were responsible for retaining CentiMark's monies and not them, the absence of evidence pertaining to the decision to not to remit monies owed and who actually did participate is certainly prejudicial to CentiMark.

Although William and Maryella concede that at least some of the documents at issue are relevant to the instant litigation, they nevertheless argue that sanctions are unwarranted because CentiMark has failed to show that the lost documents would have been helpful to its case or harmful to them. The Pegnatos aver that absent some evidence suggesting what the contents of the documents would be, CentiMark's argument of prejudice in nothing more than pure speculation.

Where documents no longer exist, however, it appears there will always be a degree of speculation as to their contents. See In re Wechsler, 121 F. Supp. 2d 404, 423 (D. Del. 2000). Accordingly, "a party need not conclusively demonstrate that the evidence would have established liability on the part of the spoliator." Id. Rather, it needs only to "come forward with plausible, concrete suggestions as to what the [lost] evidence might have been." Id., quoting Schmid, 13 F.3d at 80.

To that end, CentiMark has pointed to a series of emails between Donna Taylor,

Pegnato's National Account Manager, and Susan Crile, a marketing representative for CentiMark/Pegnato, which suggest that Mr. Pegnato made certain decisions regarding how and when CentiMark was to receive its money, and the letter agreement dated February 15, 2005, signed by Maryella as the President of Pegnato, in which the parties' respective rights with respect to the money received by CentiMark directly from its customers was discussed and in which Maryella agreed as to how CentiMark was to be paid.  See Pl.'s Spoliation Exhs. M, N. Because these documents suggest that both William and Maryella participated in the how and when CentiMark's money was to be remitted, in the Court's view, it is more than plausible that other documents, in particular internal correspondence and memoranda, would speak to the issue as well.  As such, CentiMark's claim of prejudice transcends the speculative level.[3]

Citing to Mathias v. Jacobs, 197 F.R.D. 29, 38 (S.D.N.Y. 2000), order vacated on other grounds, 167 F. Supp. 2d 606 (S.D.N.Y. 2001) ("Mathias"), the Pegnatos also argue that CentiMark has not been prejudiced by the demise of Pegnatos' internal documents because it had alternative means to obtain evidence regarding William and Maryella's participation in Pegnato's failure to pay.  Specifically, the Pegantos aver that they identified a number of individuals in their deposition testimony and in their initial disclosures as being responsible for the decision not to remit CentiMark's monies who CentiMark could have deposed and that they should not be

---

[3]The Court also rejects the Pegnatos' suggestion that CentiMark has not been prejudiced by the loss of these documents because CentiMark's document requests were so overly broad that most of the responsive documents would more than likely have been irrelevant to the instant litigation.  This argument, however, is not only a comfortable one to make knowing that the documents at issue no longer exist, but does not negate the fact that at least some of the documents were likely to be highly relevant. Indeed, in their initial disclosures submitted pursuant to Fed. R. Civ. P. 26 (a)(1), defendants themselves have identified some of these documents, i.e., board meeting minutes, as being relevant to the claims and defenses at issue.  See Pl.'s Spoliation Exh. B.

penalized because CentiMark failed to do so.

In <u>Mathias</u>, the plaintiff and his former business associate entered into an Agreement pursuant to which the plaintiff had five years to exercise certain stock options. When he attempted to exercise that option, the defendant refused to deliver the stock arguing that the plaintiff had forfeited any entitlement to it by violating a Non-Compete Agreement whereby the plaintiff agreed not to have contact with any persons or business related to the waste disposal industry for two years. <u>Id.</u> at 34-35. During the course of the ensuing litigation it was discovered that the plaintiff had destroyed telephone lists relevant to the issue of whether he had contact with persons or entities prohibited under the Non-Compete Agreement, and that he did so after the defendant had requested documents in discovery that encompassed those lists. <u>Id.</u> at 35-36. The defendant filed a motion for spoliation sanctions against the plaintiff which the Court denied finding that, although the plaintiff violated his duty to preserve evidence relevant to the litigation, the degree of prejudice suffered by the defendant did not require sanctions since the substance of the discarded materials had been transferred to the plaintiff's Palm Pilot which had been produced. Moreover, the Court found that the telephone numbers themselves would not speak to whether the plaintiff had actually made contact with any of the individuals listed and that the defendant could, and seemingly would have to, obtain that information through the plaintiff's telephone records or directly through the contacts themselves. <u>Id.</u> at 38-39. The Court further found that any information obtained by the contacts themselves could be verified by determining whether their telephone numbers appear on the plaintiff's billing records during the relevant time frame. <u>Id.</u> at 39.

Here, unlike in <u>Mathias</u>, no duplicative documentary evidence appears to exist

that would provide CentiMark with the precise information sought from Pegnato's internal correspondence, memoranda and board meeting minutes. Moreover, even if CentiMark had deposed the individuals identified by the Pegnatos as having knowledge regarding whether and when to pay CentiMark, it still has been deprived of the ability to verify or otherwise test the accuracy of that testimony by other means, i.e., the missing documents, which the defendant in Mathias was able to do. Indeed, as argued by CentiMark, testimony from individuals regarding events that occurred three and one-half years earlier is simply not the equivalent of documentary evidence created contemporarily with the events at issue. Under these circumstances, the Court finds that CentiMark has been significantly prejudiced by the Pegnatos' failure to preserve the documents in question.[4]

Having found that the Pegnatos breached their duty to preserve evidence relevant to this litigation and that CentiMark has been prejudiced by their failure to do so, the remaining question is what sanction is appropriate.

As previously discussed, where a party destroys or fails to preserve relevant evidence, district courts have the discretion to impose a number of sanctions including summary judgment and/or dismissal of claims, the exclusion of countervailing evidence, and a jury instruction on the spoliation inference. Walters v. General Motors Corp., 209 F. Supp. 2d at 490. See Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 111 (E.D. Pa. 2005) ("There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of

---

[4]Although CentiMark has also suggested that the prejudice it has suffered has been compounded by the fact that the Pegnatos, who were shareholders and officers of Pegnato when it filed its bankruptcy petition, failed to produce a Rule 30(b)(6) deposition witness as had been noticed, it would appear that the time to complain was when the deposition was scheduled and no representative appeared to testify and not four months later after discovery has closed in a motion for spoliation of documents.

evidence; rather such a decision is left to the discretion of the Court"). Spoliation sanctions should serve three functions: a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation; a punitive function, by punishing the spoliator for its actions; and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be. Mosaid, 348 F. Supp. 2d at 335. In determining what sanction is appropriate, the court should "select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." Schmidt, 13 F.3d at 79, quoting Gorelick, Marzen and Solum, *Destruction of Evidence*, § 3.16, p. 117 (1989).

CentiMark concedes that dismissal of the case is not warranted under the circumstances presented here but asks that William and Maryella be precluded from offering any testimony regarding the individuals who did and/or did not participate in the retention of CentiMark's money since, without the documents at issue, it will be unable to refute the Pegnatos' testimony that they did not participate in the retention of CentiMark's monies. William and Maryella counter arguing that suppressing their testimony in this regard is unwarranted because it would, in effect, prevent them from presenting a defense to CentiMark's claim and, thus, is out of proportion to the acts committed by them and the prejudice suffered by CentiMark. The Pegnatos further suggest that if sanctions are warranted at all, a spoliation inference, which is less onerous, would be more appropriate.

Although the court finds that the degree of fault on the part of the Pegnatos and the prejudice suffered by CentiMark is far greater than that suggested by defendants, we agree that precluding their testimony regarding the individuals who did and/or did not participate in the

retention of CentiMark's money would effectively prevent the Pegnatos from defending themselves against CentiMark's claim for conversion and would be tantamount to dismissing the action altogether -- a sanction that CentiMark has expressly conceded is not required here. As such, the question becomes whether a spoilation inference will suffice to level the playing field.

> The spoilation inference is an adverse inference that permits a jury to infer that "destroyed evidence might or would have been unfavorable to the position of the offending party." *Scott [v. IBM Corp.*, 196 F.R.D. 233, 248 (D.N.J. 2000)]. This inference is predicated upon the common sense observation that when a party destroys evidence that is relevant to a claim or defense in a case, the party did so out of the well-founded fear that the contents would harm him. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995); *Schmid*, 13 F.3d at 78.

Mosaid, 348 F. Supp. 2d at 336. The spoilation inference has been found to apply where: 1) the relevant evidence was within the party's control; 2) the party's conduct resulted in the actual suppression or withholding of the evidence; 3) the evidence destroyed or withheld was relevant to claims or defenses; and 4) it was reasonably foreseeable that the evidence would later be discoverable. Id., citing Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995).

In the present case, the Pegnatos failure to preserve Pegnato's internal correspondence, memoranda and board meeting minutes undoubtedly satisfies factors one, three and four. As previously discussed, the documents were not only within the Pegnatos' control for six months after this suit was initiated but were clearly relevant to CentiMark's conversion claims. Moreover, given their relevance, it was certainly foreseeable that they would be discoverable during the course of this litigation.

With respect to the second factor -- whether there has been "actual suppression or

withholding of evidence" -- while it is not entirely clear whether the Court of Appeals for the Third Circuit intended this factor to require at least some bad faith, several courts within the Third Circuit have found that it does not, and have found that even negligent destruction of evidence is sufficient to give rise to the spoliation inference.  Mosaid, 348 F. Supp. 2d at 337-38.  See Travelers Property Casualty Co. v. Cooper Crouse-Hinds, LLC, No. 05- 6399, 2007 WL 2571450, at *7 n. 35 (E.D. Pa. Aug. 31, 2007).  Indeed, as the Court in Mosaid has stated, permitting the spoliation inference even where there is no evidence of bad faith still serves the remedial function of leveling the playing field after a party has destroyed -- or in this case failed to preserve -- relevant evidence as "common sense dictates that the party is more likely to have been threatened by that evidence."  Mosaid, 348 F. Supp. 2d at 338, citing Schmid, 13 F.3d at 78.  Moreover, the Pegnatos have not argued that a finding of bad faith is necessary before a spoliation inference should be given but, rather, citing to Mosaid, have recognized that the negligent destruction of evidence may suffice to support an adverse inference instruction.  Defendant's Brief, p. 15 [Dkt. 65].  Thus, notwithstanding the lack of any direct evidence of bad faith on the part of the Pegnatos, the second factor requiring a spoliation inference has been satisfied as well and an appropriate instruction will be given to the jury at trial.

Although the Court recognizes that CentiMark will arguably be somewhat limited in its ability to refute the Pegnato's testimony that they did not participate in the retention of its money, there is at least some evidence of record to the contrary.  Indeed, the emails between Donna Taylor and Susan Crile and the letter agreement signed by Maryella in early 2005, suggest that the Pegnato's did, in fact, participate in Pegnato's refusal to remit CentiMark's monies and would permit CentiMark to argue as much to the fact finder.  Moreover, CentiMark has also

submitted in conjunction with its motion for summary judgment a sworn declaration submitted by William during the bankruptcy proceedings which evidences his direct involvement in Pegnatos' financial decisions concerning the Alliance.  <u>See</u> Pl.'s Appx., Exh. N, ¶ 3.  CentiMark also claims in its motion for summary judgment that William consistently represented himself to John Heisy, the Executive Vice-President and Treasurer of CentiMark, as the individual responsible for overseeing Pegnato's performance under the Alliance.  <u>Id.</u> at Exh. A, ¶ 17.  This evidence, coupled with an adverse inference instruction indicating to the jurors that the Pegantos were in possession and control of certain documents during the course of the litigation, that the documents were relevant to the disputed issues in the case and, thus, should have been produced during discovery, and that because the Pegnatos breached their duty to preserve the evidence they are permitted to infer that the documents would have been unfavorable to defendants, should suffice to level the playing field.

IV.    <u>Motions for Summary Judgement</u>

A.    <u>Standard of Review</u>

Summary judgment is warranted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56, summary judgment will be entered against a party who cannot sufficiently demonstrate the existence of an element essential to its case on which it will bear the burden of proof at trial.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322 (1986).  In evaluating the evidence at the summary judgment stage, the court interprets the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in its favor.  <u>Watson v. Abington</u>

Township, 478 F.3d 144, 155 (3d Cir. 2007). The initial burden is on the moving party to demonstrate that the record evidence creates no genuine issue of material fact. Conoshenti v. Public Service Electric & Gas Company, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if a reasonable jury could return a verdict for the non-moving party. McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005). When the moving party has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

B.     CentiMark's Motion for Summary Judgment against Pegnato

CentiMark first argues that Peganto breached the Alliance as a matter of law thereby entitling it to judgment in its favor.

Under Pennsylvania law, in order to establish a cause of action for breach of contract a plaintiff must prove: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages resulting therefrom. Key Consolidated 2000, Inc. v. Troost, 432 F. Supp. 2d 484, 487 (M.D. Pa. 2006), citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999).

Here, CentiMark has provided evidence that it entered into the Alliance with Pegnato in 2001, whereby Pegnato agreed to perform roofing services on behalf of CentiMark, including emergency repairs, comprehensive repairs, site inspections and data gathering, preventive maintenance, and warranty work. See Plaintiff's Statement of Material Facts ("SOF"), ¶ 10, 12-13 [Dkt. 46]. Peganto also agreed to collect the monies owed for the services rendered from the customers and remit a portion of the payments received to CentiMark. Id. at ¶¶ 16-19. CentiMark has also presented evidence which demonstrates that while Pegnato

initially performed repairs, collected monies from the customers and remitted a portion of those monies to CentiMark, it stopped remitting payments to CentiMark beginning in August of 2004, even though it continued to perform roofing services and collect monies from customers under the Alliance.  Id. at ¶¶ 28, 38, 39.  As well, CentiMark's evidence establishes that Pegnato continues to retain its portion of the monies collected under the Alliance which totals $142,644.68.  Id. at ¶¶ 42, 45.

These facts clearly establish that Pegnato is in breach of the Alliance and that CentiMark has suffered damages as a result.  Consequently, the burden then shifts to Pegnato to set forth facts which would demonstrate that a genuine issue as to a material fact exists for trial. Fed. R. Civ. P. 56(e)(2).  See Celotex v. Catrett, 477 U.S. at 324.  Peganto, however, has not responded to CentiMark's motion at all much less provided the Court with facts or evidence that would suggest that there is a genuine issue for trial.  As such, Pegnato has not met its burden and the facts as set forth by CentiMark remain undisputed thereby entitling CentiMark to judgment in its favor.  See W.D. Pa. L.R. 56.1 E. ("Alleged material facts set forth in the moving party's Concise Statement of Material Facts ... will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party").

C.    CentiMark's Motion for Summary Judgment against William and Maryella; William and Maryella's Motion for Partial Summary Judgment

The remaining question is whether William and Maryella are individually liable for conversion of the funds withheld from CentiMark in defiance of the terms of the Alliance.

CentiMark claims that William[5] was an active participant in Pegnato's decision to withhold funds from CentiMark and, as such, is individually liable for the  alleged conversion of the funds. William and Maryella's motion counters that the complaint fails to state a claim of conversion against them individually as a matter of law and fact.  In deciding these cross motions for summary judgment, the court must first determine if any of the purely legal arguments warrant an award of summary judgment.

      First addressed is William and Maryella's position that CentiMark's conversion claim is actually a breach of contract action masquerading as a tort and, therefore, is barred by Pennsylvania's "gist of the action" doctrine.[6]  In <u>Pittsburgh Construction Company v. Griffith</u>, 834 A.2d 572 (Pa. Super. 2003), <u>appeal</u> <u>denied</u>, 578 Pa. 701, 852 A.2d 313 (2004) ("<u>Griffith</u>"), the Pennsylvania Superior Court observed that "courts are cautious about permitting tort recovery based on contractual breaches.  In keeping with this principle, this Court has recognized the 'gist of the action' doctrine, which operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims."  <u>Id.</u>  at 581. (citations omitted).  The conceptual difference between breach of contract and tort claims was explained in <u>eToll, Inc. v. Elias/Savion Advertising, Inc.</u>, 811 A.2d 10 (Pa. Super. 2002):

> Although they derive from a common origin, distinct differences between civil actions for tort and contract breach have been developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals . . . .  To permit a

---

[5]    CentiMark's motion for summary judgment does not address the issue of  Maryella's individual liability.

[6]    Under the terms of the Alliance, Pennsylvania law governs.  Pl.'s Appx., Exh. D, ¶ 16.

> promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

Id. at 14, quoting Bash v. Bell Telephone Company, 411 Pa. Super. 347, 356, 601 A.2d 825, 829 (1992).

A tort claim is precluded by the gist of the action doctrine if: (1) it arises exclusively from the contract between the parties; (2) the duties allegedly breached were created and established by the contract; (3) the liability flows from the contract; or (4) the tort claim either mirrors a breach of contract claim or its success is totally dependent on the terms of a contract. Tsudis Chocolate Co. v. FGH Consulting USA, Inc., No. 07-1574, 2008 WL 219348, at *2 (W.D. Pa. Jan. 25, 2008).

William and Maryella, however, cannot invoke the gist of the action doctrine to foreclose litigation of the conversion claim against them individually because they, as individuals, were not parties to the contract with CentiMark. See Levert v. Philadelphia International Records, No. 04-1489, 2005 WL 2271862, at *3 (E.D. Pa. Sept. 16, 2005) (Finding that non-parties to a contract cannot invoke the gist of action doctrine to preclude conversion claims against them); Fleet National Bank v. Boyle, No. 04-277, 2005 WL 2455673, at *11 (E.D. Pa. Sept. 12, 2005) (Noting that the defendant had failed to cite any authority for the proposition that non-parties to a contract are subject to gist of action doctrine and, thus, the plaintiff's claim was not barred). The Alliance was entered into between CentiMark and Pegnato, only. While William's name appears on the signatory line of the Alliance, it was executed by him in his capacity of CEO of Pegnato. Pl.'s Appx., Exh. D, p. 7.

Bealer v. Mutual Fire, Marine and Inland Insurance Company, No. 04-5915, 2005

WL 1819971 (E.D. Pa. Aug. 1, 2005), <u>aff'd</u>, 242 Fed. Appx. 802 (3d Cir. 2007), <u>cert.</u> <u>denied</u>, ___ U.S. ___, 128 S. Ct. 1260 (2008), is not to the contrary.  In <u>Bealer</u>, while the court found that the gist of the action doctrine applied to preclude the plaintiff from pursuing certain tort claims against individual corporate officers, there was no discussion that the individuals were sued in anything but their corporate capacity, <u>i.e.</u>, there was no allegation concerning personal liability of those officers.  Indeed, it can be inferred that the individual defendants were sued only in their corporate capacity in that the breach of contract claim in that case was dismissed against the corporate officers because they were acting in behalf of the disclosed principal.  <u>Id.</u> at *11 n 9.  Thus, William and Maryella's position that <u>Bealer</u> casts doubt on the edict that one must be a party to the contract to advocate a gist of the action argument is unsubstantiated.

William and Maryella also contend that CentiMark's quest to impose liability for conversion based upon Pegnato's alleged failure to remit funds owed to CentiMark under the Alliance is actually a claim that Pegnato defaulted on a debt obligation.  Because Pennsylvania law instructs that failure to pay a debt is not a conversion, the Pegnatos argue that CentiMark's claim is not cognizable.  <u>See</u> <u>Francis J. Bernhardt, III, P.C. v. Needleman</u>, 705 A.2d 875 (Pa. Super. 1987) ("<u>Bernhardt</u>").

A conversion occurs when a one deprives another of "his right to a chattel or interferes with [one's] use or possession of a chattel without . . . consent and without lawful justification." <u>Griffith</u>, 834 A.2d at 581.  A plaintiff must establish a present possessory right to the chattel to assert a conversion claim.  <u>Id.</u>  Money may be the subject of a conversion, although failure to pay a debt may not.  <u>Bernhardt</u>, 705 A.2d at 878.

While the Alliance is the basis of Pegnato's duty to remit a portion of the

proceeds collected from roofing customers to CentiMark, payments due under such an agreement are not necessarily contractual debts.  For example, in <u>Bernhardt</u>, an attorney's failure to pay a referring attorney a contractually agreed percentage of settlement proceeds constituted a conversion.  <u>See</u> <u>also</u> <u>Shonberger v. Oswell</u>, 365 Pa. Super. 481, 486, 530 A.2d 112, 114-15 (1987) (A conversion occurred when the defendant failed to remit proceeds as required by the consignment contract); <u>Pearl Assurance Co. v. National Insurance Agency, Inc.</u>, 150 Pa. Super. 265, 271, 30 A.2d 333, 337 (1942) (Finding that fraudulent conversion occurs when one entrusted to deliver money to another applies the money to his own use).  Also, in <u>Levert</u>, a federal court in the Eastern District of Pennsylvania denied a music producer's motion to dismiss the plaintiffs-songwriters' conversion action, reasoning that royalty payments are similar to payments made under a consignment contract and did not constitute a debt owed by defendant to plaintiffs.  <u>Levert v. Philadelphia International Records</u>, 2005 WL 2271862, at *4.

Here, the undisputed facts reveal that under the terms of the Alliance, once a customer paid Pegnato for roofing services, a portion of the proceeds remitted belonged to CentiMark.  At the point of payment, CentiMark had a possessory interest in the percentage amount outlined by the Alliance; in turn, that amount never became the property of Pegnato.  The Alliance, therefore, created separate property interests in the money, and not a traditional debtor/creditor relationship.  Pegnato's subsequent failure to pay CentiMark the specified amount due is akin to the attorney's failure to pay the contractually agreed percentage of settlement proceeds in <u>Bernhardt</u>, the consignment amount due in <u>Shonberger</u>, and the royalty payments discussed in <u>Levert</u>,  and can rightly be considered a conversion of those funds.

The court must now decide whether, as CentiMark alleges, the undisputed facts

demonstrate that William is personally liable for conversion of CentiMark's property, and/or as William and Maryella argue, those facts compel the opposite conclusion.[7] While theoretically the cross motions are decided independently, since the averments of each parties' motion requesting summary judgment in their favor also form the basis for their respective responses in opposition to the other's motion, the parties' positions will be discussed in tandem.

CentiMark contends that William is personally liable for conversion under Pennsylvania's "participation theory." Under Pennsylvania law, corporate officers are only individually liable for tortious activities in which they personally participate. Wicks v. Milzoco Builders, Inc., 503 Pa. 614, 621, 470 A.2d 86, 90 (1983). See Loeffler v. McShane, 372 Pa. Super. 442, 446, 539 A.2d 876, 878 (1988) (Finding that the officer of a corporation was personally liable for participating in the commission of tort). CentiMark posits that William was the CEO of Pegnato during the time period when the conversion of its funds occurred and was personally involved in the decision to withhold the amounts due under the Alliance. CentiMark maintains that the email exchange in March 2004 between the companies' representatives concerning whether payment by check rather than wire transfer would be acceptable evidences William's direct involvement in controlling the timing and manner in which CentiMark received its portion of the money under the Alliance. More to the point, CentiMark avers that in November 2005, when Pegnato filed its bankruptcy petition, and continuing throughout the course of those proceedings, William stated in sworn declarations that he was the CEO of Pegnato, had been in that position since 1992 and had personal knowledge of all aspect's of

---

[7] It must be assumed at this juncture, that due to Peganto's failure to respond to CentiMark's motion against it, that Pegnato in fact withheld money owed to CentiMark under the Alliance.

Pegnato's day-to-day operations, and was responsible for all facets of Pegnato's financial affairs. CentiMark acknowledges William's deposition testimony that he temporarily relinquished his chairmanship in 2003, but cites this statement as an attempt to unlawfully create an issue of fact by contradicting his prior sworn testimony in the bankruptcy proceeding.

In opposition to CentiMark's motion and in support of his motion, William does not decry the general correctness of the participation theory, but claims that it is inapplicable to him because he was not an officer of the corporation during the time of the alleged conversion. He does not dispute that he intermittently served as CEO of Pegnato, but asserts that he did not function in that capacity during the period when funds were withheld from CentiMark. According to William, he was CEO of Pegnato from its inception in 1992 until 2003, when he resigned at the behest of the investment groups whose ownership interests had gradually eclipsed his and Maryella's percentage of shares. William claims that when the Alliance was executed in 2001 through its termination in 2005, various chief financial officers hired by the investment groups were responsible for any decisions concerning disbursement of Alliance-generated funds to CentiMark. Regarding his mention in the March 2004 email, William avers that he posed the alternative form of payment question to CentiMark as a conduit for Pegnato's chief financial officer and that this derivative activity cannot be construed as evidence of his authority to make a decision about whether CentiMark should be paid.

Concerning his sworn representations in the bankruptcy court, William informs that he was re-elected to the chairmanship of Pegnato in November 2005, when, in anticipation of the bankruptcy proceedings, the officers and directors of Pegnato resigned. He further acknowledges that, as the sole remaining Pegnato corporate officer, he executed pleadings and

documents during the bankruptcy proceedings as the CEO of Pegnato, attesting to his knowledge of the day-to-dy operations of Pegnato. William contends, however, that nothing in the bankruptcy findings suggests that he was responsible for any decisions concerning the CentiMark funds during the time period in question.

In opposing Williams' summary judgment motion, CentiMark reasserts its position that there was no interruption in William's tenure as Pegnato's CEO and again refers to the 2004 "check v. wire transfer" email and his sworn declarations in the bankruptcy court as evidence of his direct involvement in Pegnatos' financial decisions concerning the Alliance. CentiMark also claims that William consistently represented himself to John Heisy, the Executive Vice-President and Treasurer of CentiMark, as the individual responsible for overseeing Pegnato's performance under the Alliance.

In reviewing the arguments submitted by CentiMark and William, this court finds that an issue of fact remains in dispute as to whether or not William was directing the financial affairs of Pegnato during the relevant time period. The only neutral evidence concerning this factual dispute found by this court is included in the Notice of Setting/Increasing Insider Compensation form filed in the bankruptcy court on December 2, 2005. In this document, William attests that he is the CEO of Pegnato and was originally employed in that capacity on January 1, 1992. Line eight on the form requests the following information: "If previously employed by [Pegnato] within past two years in a different position, state the position(s) and date(s)." William responded "N/A." Pl.'s Appx., Exh. K.

While this answer is indicative of a finding that William did not relinquish his CEO position during the time when the funds were withheld, it is not compelling enough

evidence to label what might eventually be the outcome-determinative fact as undisputed. For this reason, CentiMark's motion for summary judgment against William will be denied. As the question of the nature and breadth of William's participation in Pegnato's activity is also integral to the disposition of the defendants' motion for summary judgment, the motion is denied to the extent it concerns William's personal liability.

The final matter is whether Maryella is entitled to summary judgment on the conversion count. While Maryella testified that she did not have any involvement in Pegnato's alleged tortious conduct as regards the CentiMark funds, CentiMark offers that Maryella's negotiation of and signature as "President" to the February 11, 2005 settlement letter agreeing that CentiMark would apply money paid directly by customers to the balance owed by Pegnato, establishes that she actively participated in Pegnato decisions pertaining to the payment of money to CentiMark. In the Court's view, this evidence is sufficient to defeat an award of summary judgment in her favor on the conversion count.

For these reasons, IT IS HEREBY ORDERED that the motion to withdraw as counsel for Pegnato [Dkt. 34] is DENIED.

It is FURTHER ORDERED that the motion for spoilation sanctions filed by CentiMark [Dkt. 62] is GRANTED insofar as CentiMark seeks to have sanctions imposed against the Pegnatos. An appropriate spoilation inference will be given to the jury at trial.

It is FURTHER ORDERED that the motion for summary judgment filed on behalf of CentiMark [Dkt. 44] is GRANTED as against Pegnato and DENIED as to William and Maryella Pegnato.

It is FINALLY ORDERED that the motion for partial summary judgment filed on

behalf of individual defendants, William S. Pegnato and Maryella Pegnato [Dkt. 48] is denied.

By the Court,

/s/   *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 5 May, 2008

cc:     All counsel of record by Notice of Electronic Filing