IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CENTIMARK CORPORATION,              )
                                    )
        Plaintiff,                  )
                                    )
    vs.                             )    Civil Action No. 05-708
                                    )
PEGNATO & PEGNATO ROOF              )    Chief Magistrate Judge Amy Reynolds Hay
MANAGEMENT, INC., D/B/A             )
PEGNATO & PEGNATO BUILDING          )
SYSTEM SERVICES, INC., and          )
WILLIAM S. PEGNATO, and             )
MARYELLA PEGNATO,                   )
                                    )
        Defendants.                 )


FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAY, Chief Magistrate Judge

    On May 23, 2005, the plaintiff, CentiMark Corporation ("CentiMark"), brought suit

against Pegnato & Pegnato Roof Management, Inc., d/b/a Pegnato & Pegnato Building System

Services, Inc. ("Pegnato" or "the Company") and William and Maryella Pegnato ("the

Pegnatos"). The complaint included breach of contract, conversion and unjust enrichment

counts, and a request for accounting against Pegnato. Complaint ("Compl."), Counts I-IV. The

complaint also included a conversion claim against William and Maryella Pegnato, individually.

Compl., Count III.

    In September, 2005, counsel advised that the matter had been settled and the Court

decreed that the case be marked closed, noting that "the only matters remaining to be completed

are the payment of the settlement proceeds, if any, and the submission of a stipulation for

dismissal ...." See Dkt. [11]. The Court also informed that the order was not a dismissal or

disposition of the action and retained jurisdiction to consider any issue arising until the settlement was finalized. Before a stipulation of dismissal had been filed, however, Pegnato filed a Voluntary Petition seeking Chapter 11 relief in the United States Bankruptcy Court for the Central District of California. On January 3, 2006, the bankruptcy court entered an order approving the sale of substantially all of Pegnato's assets to First Service Networks, Inc. ("First Service"), and the bankruptcy case was thereafter dismissed and closed.

On April 16, 2007, the Court granted CentiMark's consent motion to reopen the case and place it on the active docket. The action was designated for placement in the Court's Alternate Dispute Resolution ("ADR") Program and the parties stipulated to mediation before a neutral arbitrator. That process failed to produce a settlement and discovery proceeded.

After the disposition of various pretrial motions, the sole remaining claim, i.e., the conversion claim against William and Maryella Pegnato, was tried to the Court on February 9-10, 2009.[1] Having heard the testimony and reviewed the exhibits, pursuant to Fed.R.Civ.P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

A.     The Parties

1.      CentiMark is a Pennsylvania corporation that markets, sells, installs, and services roofs and roofing systems to commercial and industrial customers in the United States, Canada, Mexico and Puerto Rico. Compl., ¶ 1; Trial Transcript 2/9/09 ("Tr.1") at 14-15.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties consented to have a United States magistrate judge conduct all proceedings in this case, including the entry of final judgment. Dkt. [30], [31].

2.      Pegnato was a California corporation co-founded by the Pegnatos in 1992.  Answer, ¶ 2; Tr.1 at 93-94, 147.  William Pegnato was the Chief Executive Officer ("CEO") of Pegnato when it was founded.  Tr.1 at 147.  William Pegnato continued to serve as the CEO through at least November, 2005.  See Ex. 6 and Ex. 23 at 2.  At various times, Maryella Pegnato served as the President, Secretary and Chief Operating Officer of the Company.  Tr.1 at 93-96.  The Pegnatos were the majority shareholders of the company when it was founded.  Tr.1 at 96-97; Trial Transcript 2/10/09 ("Tr.2") at 39.

B.      Ownership Changes at Pegnato

3.      In 1999, in order to raise capital, the Company sold 25% of its stock to two investor groups, Everest Investors and Link Net, with each group taking 12.5% of Pegnato's outstanding shares in consideration of a cash infusion to the Company.  Tr.1 at 97-98, 125-26; Tr.2 at 5-6, 39.

4.      Robert Nettinga and his brother, Paul Nettinga, headed the Link Net investment group. Tr.2 at 5-6, 39.

5.      As part of their agreement to provide capital to the company, the investors required the Company to meet certain financial targets at the end of one calendar year.  Tr.1 at 97-98, 125-27; Tr.2 at 5-6, 39.

6.      If the Company was unable to meet these targets, the investment groups would collectively take control of 51% of the company's stock.  Tr.1 at 97-98, 125-27; Tr.2 at 5-6, 39.

7.      In 2000, the Company failed to meet these financial targets and the investors obtained 51% of the Company's stock.  Tr.1 at 97-98, 125-27; Tr.2 at 5-6, 39.

8.      William Pegnato testified that in 2003, Robert Nettinga became CEO of the Company and Mr. Pegnato became its President.  Tr.1 at 147-48.

C.     Conducting Business

9.     The Company conducted business by, *inter alia*, e-mail and memoranda.  Tr.1 at 32; Exs. 2, 15-20, 22.

10.    The Company had a Board of Directors which held meetings that often concerned the financial affairs of the Company.  Tr.2 at 16-17.

D.     The Strategic Alliance

11.    In 2001, CentiMark and Pegnato discussed forming a strategic alliance that would enable CentiMark to more effectively and efficiently service customers.  Tr.1 at 19-20.  William Pegnato was the Company's sole representative in these discussions.  Tr.2 at 180.  At the time, he was the CEO of Pegnato, running the entire operation of the Company.  Tr.1 at 179.

12.    On August 22, 2001, CentiMark entered into a Strategic Alliance Agreement ("Agreement") with Pegnato whereby Pegnato would provide roofing services to customers on CentiMark's behalf.  Exhibit ("Ex.") 1 at ¶ 1.

13.    The services provided included (1) emergency repairs, (2) comprehensive repairs, (3) site inspections and data gathering, (4) preventive maintenance, and (5) CentiMark warranty work.  Ex. 1 at Exs. A.1 through A.5 thereto.

14.    Customers were to be charged $125 per hour for emergency repair services, which charge was comprised of a $41.00 markup for CentiMark and $84.00 for Pegnato for performing the services.  Pegnato was required to bill the customer for services rendered, collect the monies owed, and remit – by wire transfer on a weekly basis – CentiMark's portion of the money as follows:

> Pegnato will bill the Customer directly at the rate of $125.00 per hour. Upon receipt of payment from Customer, Pegnato will pay CentiMark their markup for the invoice (that is, $125.00 - $84.00 = $41.00) for each hour of service performed. Said payment to CentiMark will be made each Tuesday via direct electronic deposit to CentiMark for all payments received from Customers from the previous Monday to the week earlier Monday before the Tuesday payment date.

Ex. 1 at Ex. A.1 thereto.

15. The signatories to the Agreement were William Pegnato, CEO, for Pegnato and Edward B. Dunlap, President, for CentiMark. Ex. 1, p.6.

16. For several years, CentiMark's Agreement with Pegnato was very successful. Pegnato performed the repair services, invoiced the customers, collected the money owed by the customers and wired CentiMark its portion of the money on a weekly basis. The Agreement generated close to $2 million in gross revenue during CentiMark's fiscal year ending April 2003, and CentiMark expected that number to increase to between $3 and $5 million. Tr.1 at 21-22, 28-31.

17. Under the terms of the Agreement, Pennsylvania law is to govern disputes related to the performance of the Agreement. Exh. 1, ¶ 16.

D.    Pegnato's Financial Situation and Its Impact on the Alliance Agreement

18. Beginning in 2002 and continuing into 2005, Pegnato experienced rapid growth, during which time the Company needed additional capital to fund that growth. Tr.2 at 48-49.

19. With the rapid expansion, Pegnato experienced cash flow problems and by 2003 was struggling to maintain sufficient cash to pay its obligations. Tr.1 at 183; Tr.2 at 4-5.

20.    In mid-2003, the Company obtained additional funds through a California Economic Development Loan ("CEDL").  Tr.2 at 7-9.

21.    The CEDL loan proceeds were placed in a separate account ("the Reserve Account") at the Company's bank and could not be accessed without the authorization of Robert Nettinga. Tr.2 at 6-9, 19-21.

22.    Disbursements from the Company's operating bank account, however, did not require any authorization from Robert Nettinga.  Tr.2 at 20-21.

23.    In March of 2004, at William Pegnato's direction, Donna Taylor, a customer service representative for Pegnato, advised CentiMark that due to unspecified "internal situations" Pegnato would not be able to send wire transfers on a regular basis for 60 days and asked whether CentiMark would prefer weekly checks instead.  Tr.1 at 184-85; Ex. 2.  Neither Ms. Taylor nor William Pegnato informed CentiMark of Pegnato's then current cash flow problem; Mr. Pegnato thought it would be unwise to do so.  Tr.1 at 185-86; Ex. 2.

24.    William Pegnato testified that he does not know who at the Company made the decision to mail CentiMark checks rather than to wire transfer the money as required by the Agreement. Tr. 2 at 42-43.

25.    Pegnato sent weekly checks by mail to CentiMark for a period of time.  Tr.1 at 34-35. Pegnato then stopped transmitting CentiMark's money on a regular basis and by May 25, 2004, had not forwarded $56,086.74 of CentiMark's money.  Tr.1 at 33-34; Ex. 15.

26.    On May 25, 2004, CentiMark's President and Chief Operating Officer, Timothy M. Dunlap, asked William Pegnato for an explanation.  Ex. 15.  Mr. Pegnato responded, "I am sorry

that are [sic] payable people are behind with you.  I will make sure you are caught up this week."

Id.

27.     Pegnato did not get "caught up" as promised.  Tr.1 at 43-44.  Nor did Pegnato timely remit CentiMark's portion of the money it was collecting from customers for ongoing work being performed.  Ex. 17; Tr.1 at 44-46.

28.     On August 23, 2004, Mr. Dunlap again contacted William Pegnato about the money owed to CentiMark, which then amounted to $73,132.10.  Ex. 17.  Again, Mr. Pegnato assured Mr. Dunlap that CentiMark would receive its money and be "caught up" within "about 30 days." Id. Mr. Pegnato explained that the "tardiness" in payments was due to a computer crash.  Id.

29.     Pegnato did not get "caught up" as promised and by mid-December, 2004, had failed to remit $84,991.42.  Ex. 18.

30.     On December 23, 2004, Mr. Dunlap contacted William Pegnato again requesting an explanation.  Ex. 18.  William Pegnato responded:

> We sent out 10,000 to you last Friday.  The whole [sic] we were in
> was deeper than we thought.  We have had a very good 4th quarter
> ... so we are recovering fast.  We should be able to be caught up in
> 30 days ... .

Id.

31.     William Pegnato readily acknowledged that he never advised anyone at CentiMark that he needed the approval of others at Pegnato in order to remit CentiMark's monies to it, concluding dismissively,  "Why would I?"  Tr.1 at 196.

32.     William Pegnato testified that he recommended to Robert Nettinga that the Company pay CentiMark.  Tr.1 at 183-84, 189, 195; Tr.2 at 52-53.  According to Mr. Pegnato, Robert Nettinga

decided not to pay CentiMark because he did not want to infuse any more capital into the Company. Tr.2 at 53-54.

E.    William Pegnato's Role in the Company

33.    William Pegnato testified that in 2003, Robert Nettinga became CEO and William Pegnato became President of the Company and, thereafter, he did not have control over how the Company's money was disbursed; Robert and Paul Nettinga had that control. Tr.2 at 37-38.

34.    William Pegnato's main responsibility for the Company was "revenue." Tr.2 at 38.

35.    William Pegnato testified that he recommended that CentiMark be paid since the Agreement produced a revenue stream for Pegnato. Tr. 2 at 37-38. There is no documentary evidence in the record of this recommendation. Tr.1 at 199. William Scott, former CFO for Pegnato, had no recollection of whether or not William Pegnato made any such recommendation. Tr.2 at 29.

36.    According to a memorandum drafted by William Scott, William Pegnato directed the replacement of certain funds in the Reserve Account on January 18, 2004: "Instructions from Bill Pegnato on January 18, 2004 were to replace the funds [in the Reserve Account] as $100,000 immediately and the other $100,000 by month end." Ex. 21.

37.    In April of 2004, William Pegnato directed the movement of monies from the Reserve Account to the operating account. Ex. 22 (Memo from William Scott to Bill Pegnato, Subject "Transfer of Funds," dated April 23, 2004, which states: "Bill, Per your instructions, $60,000 will be moved from the Wells Fargo account to the US Bank operating account immediately. The funds will be transferred back to Wells on the first day collected funds availability in the US Bank account exceeds $60,000.").

8

38.     On November 1, 2004, William Pegnato sent an e-mail to Robert Nettinga concerning the

Company's account with American Express, which read in pertinent part as follows:

> American Express is calling me regarding the payment we missed
> to keep them at bay I would like your permission to access the
> savings [i.e., reserve] account for $60,000 so that we can make that
> payment  I don't want to push them over the edge

Ex. 20.

39.     The Company charged its equipment, supplies and travel expenses to its American

Express account.  Without this account, the Company could not function.  Lacking sufficient

funds in the general operating account, William Pegnato sought Robert Nettinga's authorization

in November of 2004, to move funds from the Reserve Account in order to pay the American

Express bill.  Tr.1 at 201-202.

40.     Robert Nettinga authorized the transfer of funds to pay American Express and notified the

Company's Board of Directors of this release of funds from the Reserve Account.  Ex. 20.

F.      The Offset Agreement

41.     During the life of the Agreement, on occasion, customers mistakenly sent payments to

CentiMark rather than Pegnato.  CentiMark's practice with regard to these payments was to send

the entire amount to Pegnato so that it could process the payment on its computer system, even

though Pegnato was obligated to remit a portion of the money back to CentiMark.  Tr.1 at 53-55.

42.     However, there came a time when, in light of Pegnato's failure to timely forward

CentiMark's portion of money Pegnato collected under the Agreement, CentiMark did not

forward to Pegnato the payments CentiMark received directly from customers (from October 14,

2004 through January 21, 2005), fearing CentiMark would not receive back its portion of those

payments. Tr.1 at 54-55. Instead, CentiMark proposed to Pegnato that CentiMark would retain the direct payments it had received as an offset to reduce the outstanding amount that Pegnato had failed to remit to CentiMark. Tr.1 at 55.

43.     In total, CentiMark proposed to Pegnato the retention of $15,940.50, plus $75.53 to be offset at a later date. Ex. 3. On CentiMark's behalf, Susan Crile, Marketing Representative, and John Heisey, Chief Financial Officer, discussed this proposal with Maryella Pegnato, who represented Pegnato during the discussion during a conference call in early 2005. During this conference call, Maryella Pegnato agreed to the proposal. Tr.1 at 54-58.

44.     CentiMark prepared and sent to Maryella Pegnato a confirming letter agreement setting forth the details of the proposal and requested Pegnato's written agreement to same. Ex.3 Maryella Pegnato signed the letter agreement ("the Offset Agreement") on March 21, 2005, as "President" of Pegnato.

45.     Maryella Pegnato testified that she was not, in fact, President of the Company when she signed the Offset Agreement and had not held the position of President since 2000. She further stated that Robert Nettinga approved the Offset Agreement and authorized her to sign it. Tr.1 at 96, 129-30; see also Tr.2 at 43. There is no evidence that Robert Nettinga authorized Maryella Pegnato to use the title "President" when executing the Offset Agreement if, indeed, she no longer held that position.

G.      Termination of the Alliance Agreement

46.     Under the terms of the Agreement, either party could terminate the agreement by providing 60 days' written notice. Ex. 1 at ¶ 22. In approximately April of 2005, CentiMark

gave written notice to Pegnato that CentiMark was terminating the Agreement.  Compl. ¶ 35;

Tr.1 at 89-91.

47.     Thereafter, CentiMark and Pegnato continued to discuss resolution of the money owed to

CentiMark, through correspondence and conversations.  Exs. 13 & 14; Tr.1 at 66-76.

48.     On May 3, 2005, Robert Nettinga sent a letter to CentiMark's General Counsel, Thor

DiCesare, proposing a settlement, for a discounted amount of the total sum owed, indicating that

William Pegnato would be contacting Ed Dunlap at CentiMark in the hope of reaching "a

mutually satisfactory resolution."  Ex. 13, ¶ 4.

49.     William Pegnato contacted Ed Dunlap sometime after May 3, 2005.  The conversation

was unproductive and, according to William Pegnato, Mr. Dunlap became angry and threatened

to "bury" William Pegnato.  Tr.1 at 149-50; Tr.2 at 45-46, 55-56.

50.     In an effort to salvage Pegnato's relationship with CentiMark, William Pegnato asked

Robert Nettinga to again contact CentiMark.  Tr.1 at 149-50.

51.     On May 23, 2005, Robert Nettinga sent a letter to Thor DiCesare "to reopen the

communication channels in the hope of resolving this matter without costly litigation."  Ex. 14, ¶

1.  Robert Nettinga remarked about the Company's financial difficulties, noting that, "I am the

lead investor in the company and have *now* had to become actively involved in the operations in

order to make ends meet to try and satisfy all parties."  Id. at ¶ 2 (emphasis added).  Robert

Nettinga proposed a payment plan that would provide CentiMark with the full amount of money

due it, over the course of three years.  Id. at ¶ 3.

52.     Ultimately, CentiMark rejected Pegnato's offer of a payment plan.  Tr.1 at 75.   The

Agreement dissolved in June of 2005 upon the expiration of the 60 days' notice provision.  Ex. 1

at ¶ 22.

53.     The total amount of money collected by Pegnato that it owed to CentiMark was

$142,664.68.  Tr.1 at 76.

H.      Negotiations with First Service

54.     In November 2004, Pegnato had begun negotiations with additional potential investors to

obtain an infusion of cash into the company.  Exs. 20, 23; Tr.1 at 116-20, 133-36.  A Maryland

company by the name of First Service Networks ("First Service") was one of the companies with

whom Pegnato spoke about a potential investment and/or other transaction to keep Pegnato

afloat.  Id.

55.     Pegnato and First Service entered into a Non-Disclosure Agreement in November 2004 in

order to discuss a potential "business combination."  Ex. 23, ¶ 4.  William Pegnato signed the

Non-Disclosure Agreement as CEO, on Pegnato's behalf.  Ex. 23; Tr.1 at 34, 155-56.

56.     Pegnato subsequently filed for bankruptcy protection in November of 2005.  Ex. 4; Tr.1

at 107.

57.     Before filing for bankruptcy, however, Pegnato negotiated the sale of substantially all of

its assets to First Service.  Tr.1 at 107-08.  The bankruptcy filing was a prepackaged bankruptcy

that First Service required as a condition to the purchase of Pegnato's assets.  Id.

58.     As a material term of the transaction, First Service required that William and Maryella

Pegnato accept employment with First Service.  Tr.1 at 130-31, 137-39.  First Service did not

have an office on the West Coast and the Pegnatos would operate the new office that First

Service would open in California.  Id.

59.     William and Maryella Pegnato signed written employment agreements with First Service.

Tr.1 at 139-40.  Each received a base salary of $150,000 per year and could earn an annual

performance bonus, which was expected to be 25 percent of the base salary.  Tr.1 143-44.

60.     Additionally, the Pegnatos signed a senior management bonus agreement that entitled

them to receive an additional bonus based on a specified minimum amount of earnings.  Tr.1 at

141-42.  As of the date of trial, the Pegnatos had not been paid any bonuses since First Services

had not reached the specified minimum earnings that would trigger the bonuses.  Tr.1 at 144-45;

Tr. 2 at 51-52.

I.      Bankruptcy Filings

61.     William Pegnato submitted several documents and declarations in connection with the

bankruptcy proceedings, in which he attested to facts under oath.  Exs. 5-11.  In particular,

William Pegnato submitted the following documents containing his sworn testimony:

> (a)     A Notice Setting/Increasing Insider Compensation stating that
>         William Pegnato was the CEO of Pegnato, had been the CEO since
>         1992, had not held any other position at Pegnato within the past
>         two years, and had full profit and loss responsibilities for the
>         company.  Ex. 6; Tr.1 at 151-55.
>
> (b)     The voluntary petition attesting that Pegnato expected to have
>         funds available for distribution to unsecured creditors.  Ex. 5; Tr.1
>         at 164-65.
>
> (c)     A list of the company's 20 largest unsecured creditors, which
>         included the specific amount of money that Pegnato had failed to
>         remit to CentiMark.  Ex. 7; Tr.1 at 164-65.  William Pegnato also
>         disclosed that Robert Nettinga and Paul Nettinga were
>         "consultants" to Pegnato.  Ex. 7; Tr.1 at 166-68.  Robert and Paul

Nettinga asserted unsecured claims in the amounts of $22,000 and $56,000, respectively.  Id.

(d)     A declaration dated December 5, 2005, in which William Pegnato attested that he was responsible for Pegnato's day-to-day operations, customer and vendor relationships, and all facets of Pegnato's financial affairs.  Ex. 8 at ¶¶ 2-3; Tr.1 at 168-74.  He based the declaration on his personal experience with Pegnato and his involvement in its financial affairs.  Ex. 8 at ¶ 6.

(e)     A declaration signed in early January, 2005 in which William Pegnato attested that he was responsible for Pegnato's day-to-day operations, customer and vendor relationships, and all facts of Pegnato's financial affairs.  Ex. 9 at ¶¶ 2-3; Tr.1 at 174-76.

(f)     A declaration signed in March, 2006 in which William Pegnato attested that he was responsible for Pegnato's day-to-day operations, customer and vendor relationships, and all facets of Pegnato's financial affairs.  Ex. 10 at ¶¶ 2-3; Tr.1 at 178.

(g)     A declaration signed in April, 2006 in which William Pegnato attested that he was responsible for Pegnato's day-to-day operations, customer and vendor relationships, and all facets of Pegnato's financial affairs.  Ex. 11 at ¶¶ 2-3; Tr.1 at 178.

J.     Maryella Pegnato's Participation in the Company's Financial Affairs

62.     Maryella Pegnato participated in some of the Company's financial affairs, as evidenced by her actions in connections with the Offset Agreement.  See Findings of Fact 41-45.   She discussed the matter with Susan Crile and John Heisey during a telephone conference call in late January or early February of 2005 and subsequently executed the Offset Agreement on March 21, 2005 as "President" of Pegnato.  Tr.1 at 54-58; Ex. 3.

63.     Maryella Pegnato's testimony, which downplayed her role in the financial aspects of the Company, is simply not credible.  She holds a Masters in Business Administration.  Tr. 1 at 94. She and William Pegnato started the business and ran it together for years.  She was Chief of

Operations. She agreed to and executed the Offset Agreement on Pegnato's behalf. First Service conditioned the purchase of Pegnato's assets on Maryella Pegnato's agreement to join the employ of First Service to head their West Coast division, at a handsome salary and with the potential to earn $1.5 million dollars in a management bonus, hence, it is more than reasonable to infer that First Service valued her knowledge of and experience with the entire operation of the Company, including its finances. These facts demonstrate that Maryella Pegnato played a role at times in conducting the Company's financial affairs.

64.     However, there is no evidence that Maryella Pegnato directed Pegnato not to pay CentiMark its markup under the Agreement or otherwise participated or cooperated in the conversion of CentiMark's property.

K.      William Pegnato's Participation in the Company's Financial Affairs

65.     William Pegnato, on the other hand, participated or cooperated in the conversion of CentiMark's money as evidenced by the fact that over the course of nearly a year he personally assured CentiMark that Pegnato would get "caught up" with its delinquent remittances. William Pegnato was fully aware at the time that Pegnato had collected monies that belonged to CentiMark and had not paid those monies over to CentiMark. He was also fully aware of the Company's cash flow problem and purposefully chose not to share the Company's financial circumstances with CentiMark, lest CentiMark terminate the Agreement, which was a revenue stream for Pegnato. These actions and assurances by William Pegnato kept CentiMark at bay for nearly a year and enabled the Company to continue to improperly retain and use CentiMark's monies to pay Pegnato's other bills and to delay proper remittance to CentiMark.

66.     William Pegnato's trial testimony in general appeared to be engineered to further his own agenda and, hence, lacked credibility.

67.     In particular, William Pegnato's testimony that after 2003 he was no longer CEO of the Company and had no ability to direct payment to CentiMark, and that the Nettingas were in financial control of the Company, <u>see</u> Tr.2 at 37-38, is simply not credible for the following reasons:

(a)  As evidenced by internal Company documents, at various times during 2004, William Pegnato directed the movement of Company funds and the payment of vendors/creditors, such as American Express.  <u>See</u> Findings of Fact 36-38.

(b)  As evidenced by the bankruptcy filings, William Pegnato was CEO of the Company from 1992 through 2005, or at the very least from 2003 through 2005.  <u>See</u> Finding of Fact 61(a) and Ex. 6.  At trial, Mr. Pegnato stated that he did not carefully read the bankruptcy filings before he affixed his signature to them and, therefore, mistakenly attested to facts that were not true. Tr.1 at 155.  The Court finds this explanation to be incredible.  Mr. Pegnato founded the Company and succeeded over the years in expanding it into a multi-million dollar enterprise. That he would be so cavalier in reviewing and signing documents, sworn to under penalty of perjury, that were essential to the agreement reached with First Services that was going to salvage his business, effectuate the sale of its assets and provide both Pegnatos with a solid financial future, is simply not believable.

(c)  In November of 2004, William Pegnato executed a Non-Disclosure Agreement, as CEO of Pegnato, binding the Company during the period it was in negotiations with First Service

to obtain additional cash infusion. Ex. 22. There is no evidence that William Pegnato's handwritten designation as CEO, underneath his signature on that agreement, was a mistake.

(d) William Pegnato had 20-years experience in the roofing business. The Nettingas, on the other hand, had no prior experience in the roofing industry. William Pegnato had the personal relationships with the vendors/creditors and had the most insight into whether, during the Company's cash flow problem period, a particular vendor or creditor could be "stretched" or delayed in payment and he made decisions and recommendations accordingly. Tr.2 at 24-25.

(e) In his May, 2005 correspondence with CentiMark, Robert Nettinga identified himself as Chairman, not CEO, of Pegnato. Further, he indicated that he had only recently become involved in the operations of the Company. Ex. 14 at ¶ 2 ("I am the lead investor in the company and have *now* had to become actively involved in the operations in order to make ends meet to try and satisfy all parties.")(emphasis added). Additionally, he advised CentiMark that William Pegnato was the individual in charge of efforts to resolve the payment of CentiMark's markups. Ex. 13. Finally, both Robert and Paul Nettinga filed claims in bankruptcy for monies owed to them for work as *consultants*.[2] These actions by the Nettingas are inconsistent with William Pegnato's claim that since 2003 the Nettingas were in charge of the Company and controlling its financial affairs.

(f) William Pegnato testified that he recommended that Pegnato pay CentiMark. We have only his testimony to this effect. Unlike the recommendation to pay the American Express bill, there is no documentary evidence to suggest that Mr. Pegnato made any such

---

[2] William Pegnato testified that the Company issued IRS Tax Form 1099s to the Nettingas for this work. Tr.1 at 167.

recommendation.  See Findings of Fact 32 and 35.  Further, Mr. Pegnato's explanation that the Nettingas refused to follow his recommendation because they did not want to infuse more capital into the Company, see Finding of Fact 32, makes no sense.  Because the Alliance Agreement was a revenue source, it made sense for cash-strapped Pegnato to pay CentiMark in order to maintain the revenue stream.  Assuming for the sake of argument that Mr. Pegnato in fact recommended that CentiMark be paid, there is no credible explanation for why Robert Nettinga would authorize the transfer of funds from the Reserve Account to pay the American Express bill, at William Pegnato's direction, so that the Company could continue to do business, but would fail to see the wisdom of paying CentiMark in order to maintain a revenue source that the Company desperately needed to continue to do business.

L.      Spoliation

68.     Previously, this Court determined that during discovery, CentiMark requested that the defendants produce internal correspondence regarding the Alliance Agreement, correspondence with third parties on the Agreement, including communications with First Service, and/or any board of directors, shareholder, or committee meeting minutes where the Alliance Agreement or CentiMark were discussed.  Dkt. [67] at 7-8.

69.     It is undisputed that no such documents were produced by defendants.  Counsel for defendants responded to the discovery request indicating that William and Maryella "are not the custodians of the corporation's documents, and they do not know where such documents are maintained."  Dkt. [63] at Ex. E.  Counsel for defendants subsequently informed CentiMark that the documents at issue had likely been transferred to First Service in conjunction with the sale of Peganto's assets.  Dkt. [67] at 8.

70.    On January 4, 2008, CentiMark served First Service with a subpoena seeking any relevant correspondence, memoranda and board meeting minutes that First Service received from Pegnato.   Although First Service produced several documents, Pegnato's internal correspondence, memoranda and board meeting minutes were not amongst them.   In response to a subsequent inquiry by CentiMark's counsel, First Service confirmed that it had produced all responsive documents in its possession.  <u>Id.</u>

71.    During discovery, the Pegnatos were deposed and testified that they did not participate in the retention of CentiMark's money but that others in the company were responsible for doing so. <u>Id.</u>

72.    CentiMark filed a motion for sanctions for spoliation, arguing that without Pegnato's internal correspondence, memoranda and board meeting minutes, CentiMark is unable to refute the Pegnato's testimony and asking that the Pegnatos be sanctioned for failing to preserve the documents at issue.  Dkt. [62].

73.    This Court previously determined that the Pegnatos breached their duty to preserve evidence relevant to this litigation and that CentiMark had been prejudiced by their failure to do so.  Dkt. [67] at 9-16.   As well,  this Court previously determined that CentiMark was entitled to the sanction of an adverse inference instruction to be given to the fact finder to the effect that the Pegantos were in possession and control of certain documents during the course of the litigation, that the documents were relevant to the disputed issues in the case and, thus, should have been produced during discovery, and that because the Pegnatos breached their duty to preserve the evidence, the fact finder would be permitted to infer that the documents would have been unfavorable to defendants.  <u>Id.</u> at 20.

74.     CentiMark seeks an award of prejudgment interest, dating from mid-May, 2005.  Tr.1 at

76-77.  The Pegnatos have offered no objection.

1.      Under the terms of the Agreement, Pennsylvania law governs disputes related to the

performance of the Agreement.  Exh. 1, ¶ 16.

2.      "Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel

or interferes with the plaintiff's use or possession of a chattel without plaintiff's consent and

without lawful justification."  Pittsburgh Construction Company v. Griffith, 834 A.2d 572, 581

(Pa. Super. 2003).  A plaintiff has a cause of action in conversion if he had actual or constructive

possession of a chattel or an immediate right to possession of a chattel at the time of the alleged

conversion.  Chrysler Credit. Corp. v. Smith, 643 A.2d 1098, 1100 (Pa. Super. 1994), appeal

denied, 652 A.2d 834 (1994).  Money may be the subject of conversion.  Shonberger v. Oswell,

530 A.2d 112, 114 (Pa. Super. 1987)

3.      "Conversion can result only from an act intended to affect chattel.  Specific intent is not

required, however, but rather an intent to exercise dominion or control over the goods which is in

fact inconsistent with the plaintiff's rights establishes the tort."  Shonberger v. Oswell, 530 A.2d

at 114 (citation omitted).  See also, Pittsburgh Construction Company v. Griffith, 834 A.2d at

581.

4.      The failure to pay a debt is not a conversion.  Francis J. Bernhardt, III, P.C. v.

Needleman, 705 A. 2d 875, 878 (Pa. Super. 1997)(citing Petroleum Marketing Corp. v.

Metropolitan Petroleum Corp., 151 A.2d 616 (Pa. 1959)).

5.     Here, the Agreement did not create a debtor/creditor relationship but, rather, "under the terms of the Agreement, once a customer paid Pegnato for roofing services, a portion of the proceeds remitted belonged to Centimark.  At the point of payment by the customer, CentiMark had a possessory interest in the percentage amount outlined by the Alliance" and Pegnato's failure to pay the contractually agreed upon amount was properly considered a conversion of those funds.   Dkt. [67] at 26.  See also, Bernhardt, supra (attorney's failure to pay a referring attorney a contractually agreed percentage of settlement proceeds constituted a conversion); Shonberger, 530 A.2d at 114-15 (conversion occurred when the defendant failed to remit proceeds as required by the consignment contract); Pearl Assurance Co. v. National Ins. Agency, Inc., 30 A.2d 333, 337 (Pa. Super. 1942) (fraudulent conversion occurs when one entrusted to deliver money to another applies the money to his own use); Levert v. Philadelphia International Records, 2005 WL 2271862, at *4 (E.D. Pa. 2005)(court denied music producer's motion to dismiss the plaintiffs-songwriters' conversion action, reasoning that royalty payments are similar to payments made under a consignment contract and did not constitute a debt owed by defendant to plaintiffs).

6.     On summary judgment, this Court held as a matter of law that (1) a portion of the money collected from customers under the Agreement belonged to CentiMark; (2) Pegnato converted that money when it failed to remit it to CentiMark but instead used it for Pegnato's benefit; and (3) the amount that Pegnato converted was $142,664.68.  Dkt. [67] at 22, 25-26.

7.     Under the "participation theory," an agent or officer of a corporation may be held individually liable for personal participation in tortious acts, such as conversion.  Id. (citation omitted).  See also Loeffler v. McShane, 539 A.2d 876, 878 (Pa. Super. 1988)("Under

Pennsylvania law, the general rule is that the owners and managers of corporations may be held financially accountable for their wrongful, injury-producing conduct. ... [A]n officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but ... an officer ... who takes no part in the commission of the tort ... is not personally liable ... unless he specifically directed the particular act to be done or participated, or cooperated therein." (internal citations and quotations omitted)).

8.     William Pegnato participated or cooperated in the conversion of CentiMark's money as evidenced by the fact that over the course of nearly a year he personally assured CentiMark that Pegnato would get "caught up" with its delinquent remittances.  William Pegnato was fully aware at the time that Pegnato had collected monies that belonged to CentiMark and had not paid those monies over to CentiMark.  He was also fully aware of the Company's cash flow problem and purposefully chose not to share the Company's financial circumstances with CentiMark, lest CentiMark terminate the Agreement, which was a revenue stream for Pegnato.  These actions and assurances by William Pegnato kept CentiMark at bay for nearly a year and enabled the Company to continue to improperly retain and use CentiMark's monies to pay Pegnato's other bills and to delay proper remittance to CentiMark.  William Pegnato's testimony to the contrary is not credible.  <u>See</u> Finding of Facts 66, 67.

9.     "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Mosaid Technologies, Inc. v. Samsung Electronics Co.</u>, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).

10.     This Court previously determined that the Pegnatos breached their duty to preserve evidence relevant to this litigation and that CentiMark had been prejudiced by their failure to do

so. Dkt. [67] at 9-16. As well, this Court previously determined that CentiMark was entitled to the sanction of an adverse inference instruction to be given to the fact finder that the Pegantos were in possession and control of certain documents during the course of the litigation, that the documents were relevant to the disputed issues in the case and, thus, should have been produced during discovery, and that because the Pegnatos breached their duty to preserve the evidence, the fact finder would be permitted to infer that the documents would have been unfavorable to defendants. See Dkt. [67] at 20.

11.     "[T]he inference does not supply the place of evidence of material facts and does not shift the burden of proof so as to relieve the party upon whom it rests of the necessity of establishing a prima facie case, although it may turn the scale when the evidence is closely balanced." Beers v. Bayliner Marine Corp., 675 A.2d 829, 833-34 (Conn. 1996)(citations and internal quotation marks omitted)(collecting cases).

12.     On the facts of this case, the Court does not find Maryella Pegnato to be individually liable on the conversion of CentiMark's monies since there is no evidence to suggest that she directed Pegnato not to pay CentiMark its markup or otherwise actively participated or cooperated in the conversion of CentiMark's property. Accordingly, Judgment is properly entered in favor of Maryella Pegnato and against CentiMark on the conversion claim.

13.     As noted, CentiMark has met its burden and clearly demonstrated that William Pegnato participated or cooperated in the conversion of CentiMark's money. See Conclusion of Law 8.

14.     Due to the spoliation of evidence in this case, application of the adverse inference permitted in this case allows the Court to infer that the Company's internal correspondence, memoranda, board meeting minutes and other documents that were not preserved by the

defendants would further show William Pegnato's active participation in the financial decisions of the Complaint, including the conversion of CentiMark's monies.

15.     It is within the discretion of the Court to award prejudgment interest in a tort action "in order to prevent unjust enrichment or where the payment of interest is required to avoid injustice." Sack v. Feinman, 413 A.2d 1059, 1065-66 (Pa. 1980).

16.     Here, equitable considerations guide the Court's determination to award prejudgment interest since William Pegnato participated or cooperated in the conversion of monies which he knew rightfully belonged to CentiMark.

15.     Accordingly, Judgment is properly entered in favor of CentiMark and against William Pegnato on the conversion claim in the sum of $142,644.68, plus interest (prejudgment and postjudgment) at the lawful rate of 6 % per annum.  42 Pa.C.S.A. § 8101; 41 P.S. § 202. Prejudgment interest shall start from July 1, 2005, which is the first month after the Agreement was terminated.

By the Court,

/s/   *Amy Reynolds Hay*
Chief United States Magistrate Judge


Dated:   8 June, 2009


cc:     All counsel of record by Notice of Electronic Filing